Good morning, Your Honor. My name is Mariah Gondaro, and I am an attorney for appellants. I would like to reserve two minutes for rebuttal. Please watch the clock. This case is about the right to vote and ensuring all votes are counted equally. This issue is core to our Republican form of government. The lower court improperly dismissed appellant's case, holding that they failed to allege an injury in fact. The appellants, though, have alleged three types of injuries, including voting injuries, candidate injuries, and an organizational injury under a diversion of resources theory. Regarding voting injuries, appellants allege different forms of vote dilution. Vote dilution originated in Baker v. Carr, where the Supreme Court held that appellants had standing to challenge a state reapportionment statute because they were asserting a plain, direct, and adequate interest in maintaining the effectiveness of their vote. Reynolds v. Sims affirmed Baker, holding that vote dilution was defined as where certain groups of votes are treated differently. Although these cases dealt with state reapportionment statutes, vote dilution occurs any time a group of voters are favored over other groups of voters. Vote dilution does not require a classification of a protected class. Vote dilution does not occur only when ballots are weighted differently. It can also occur when there is a procedure that results in vote cancellation or negation. First, appellants allege that the state's lack of secure laws and the county's lack of uniform vote-counting procedures injured appellants. The Supreme Court and Bush v. Gore emphasized that a lack of uniform vote-counting procedures inherently leads to disparate treatment of ballot or voters. In Bush, the record revealed that the counties applied different standards in defining a legal vote, or in other words, the intent of the voter. Here, the appellants including the votes of appellants because they vote and reside in the jurisdictions where the voting irregularities occurred. The group of voters, therefore, are the voters in those counties. The counties where appellants reside did not properly vet votes and implemented inconsistent signature-matching processes. The allegations of disparate treatment is a problem because if a voter is in Orange County, every time a signature is verified, a vote-by-mail ballot will be disregarded if there is substantial proof otherwise. Whereas if you're a voter in Los Angeles County, the vote-by-mail ballot would be subject to a process where four signature comparisons are conducted in one to five seconds. These irregularities stem back to state law. State law does not require a minimum amount of time to observe and verify signatures. There is no uniformity as to what a similar signature requires. In other words, counties are allowed to apply different requirements for points of comparison. State law does not require a specific percentage of similarity on a computer software system. State law allows election workers to excuse clearly dissimilar signatures based on the presumption that the person's signature style may have changed. So that is just one form of vote dilution. And again, to recap, that form of vote dilution is consistent with Bush Gore in that the disparate treatment and lack of uniform rules will inherently lead to disparate treatment of voters in the counties where the irregularities occur. Council, I guess I have a two-part question. I understood your complaint and your briefing to be focused more on an attack on California's statewide voting procedures that were implemented as part of the pandemic and then now have been put in permanently, and less on county-by-county variation. So my first question is, which paragraphs in the complaint are you focused on in terms of showing county-by-county differences? Yes. The specific place in the complaint where we talk about the county-by-county variations would be, I don't have the exact paragraph number for you, but it would be in the section where we lay out the different allegations in regards to each individual county. So there are different forms of vote dilution that we allege. All right. So let's set that aside for a second, and I'll have to think about that more. To the extent that you're arguing that California, the state law, is written in such a way that has inadequate procedures for verifying signatures or other voting procedures that you're challenging, how would your plaintiffs as voters be able to establish an Article III injury separate from any other voter? Again, to the extent that you're challenging California's statewide law. They establish Article III standing because they reside in vote in the counties where there were irregularities. And as a court held in Bush versus voting procedures will inherently lead to disparate results. And those unequal applications, again, stem from state law because state law does not require uniformity. So then I want to make sure that I understand your argument. I think what you're saying then is, to the extent you're arguing that the individuals as voters have standing, you're just focused on county disparities. Is that fair? Yes, Your Honor. That is one form of... Well, wait a minute. Is that one form of standing for that category, or is that the form of standing that you're arguing for, individuals as voters? That is only one form, Your Honor. I'm sorry for that. Okay. I thought that the complaint was alleging on a statewide basis that the regulations such as the voter rolls having improper parties, that people were double registered, that the vote by mail process allowed late postmarking, that there was lax signature verification process, that all of those allowed for the possibility of fraud, fraudulent voting caused voter dilution. I thought that was one of the theories that was being stated in the complaint. Am I incorrect on that? So in regards to the late voting, Your Honor, that does have to do with the disparate treatment of vote by mail voters in comparison to in-person voters. So we have alleged that in-person voters were treated in a disparate manner because vote by mail voters had more time to vote. That is our second form of vote dilution. Along that same thread, we've also alleged that this treatment inherently harms vulnerable communities who courts have found to be more likely to vote in person, including some appellants in the Election Integrity Project's own citizen observers. And the defendants try to mischaracterize this case as a case about past elections, but it is not a case about decertification. It is not a case about past elections. It is a forward-looking case that seeks to secure equal voting rights in future elections. Appellants do not allege generalized grievances of vote fraud, but have alleged how the voting irregularities diluted the votes of specific groups of voters, including themselves and other in-person voters, as well as voters who vote and reside in the counties where the irregularities have occurred. Regarding actuality and eminence, the appellants argue that appellants must show with certainty that their votes will not be counted to confer standing. But this is not the law. Courts have conferred standing to challenges to election procedures that enable vote dilution. As the Sixth Circuit astutely observed in Sandusky Company Democratic Party v. Blackwell, a voter cannot know in advance that his or her name will be dropped from the rolls or listed in an incorrect precinct. It is inevitable, however, that there will be such mistakes. The court held that the members had standing, even though appellants did not identify specific voters who will seek to vote at a polling place that will be deemed wrong by the election workers. Similarly, in Bush v. Gore, the Supreme Court found an equal protection violation, even though Bush did not allege that the vote counting procedures would harm him. Here, there is near certainty that the harm will come about because there are disparate practices resulting in irregularities in counties. Yeah, I'd like you to explain that further, because I'm looking at this and wondering why this isn't just a quintessential sort of speculative injury here. You are relying, it seems, on the possibility that certain voters, and maybe in certain counties that I'm not sure about, will choose to vote by mail, and that they'll use that procedure to cast fraudulent ballots. So you'll have to explain to me why that's not just entirely speculative. So the harm, Your Honor, is not speculative, because again, as the court held in Bush v. Gore, a lack of uniform laws inherently leads to disparate treatment. And we have alleged that because state law does not require uniformity in regards to signature verification, in regards to adjudication, in regards to ballot remaking, that there will inevitably be a disparate treatment of ballots of voters in those counties. Because it is statistically impossible for there to be an equal amount of irregularities in every single county. But regardless of the fact that we allege near certainty that there will be disparate treatment, the Supreme Court does not require that a plaintiff demonstrate that it is literally certain that the harms they identify will come about. The Supreme Court has continued to find standing based on a substantial risk that the harm will occur. Can you address organizational standing? The district court rejected the standing of the IPC as well. Why does it have standing? So the Election Integrity Project has standing because they are allowed to show, as this Supreme a frustration of its organizational mission and a diversion of its resources to combat the particular injurious behavior in question. Organizational standing need only be generally alleged. The Election Integrity Project is a California non-profit public benefit corporation committed to defending and protecting the integrity of elections and ensuring all people can participate in the election process. There are many aspects of their mission including advising legislators, researching advocacy and observation. Since California massively expanded vote by mail and gutted signature verification requirements, the organization has been required to expend additional resources to facilitate observation of voting practices and document voting irregularities across counties, whereas before that money could have been put into different parts of their mission. The lower court did not find organizational county because they held that the future expenditures were speculative because it was not clear whether expanded vote by mail and other emergency procedures were a permanent part of California's election voting system. The court was wrong for two reasons. One, we have alleged that universal vote by mail is now a permanent part of California's election system. And two, we filed a request for judicial notice demonstrating to this court that the specific regularities as it relates to signature regulations are now a permanent part of the voting procedure. And finally, in regard to candidate appellate standing, we have alleged that the candidate appellants will run this year and have standing because they can show that the current practices threaten their election prospects. In Bush, the Supreme Court found that Florida's recount system violated the Equal Protection Clause even though former President Bush did not allege the system would disfavor him. Indeed, in the application for stay presented to Justice Kennedy, Justice Scalia emphasized the irreparable harm that would befall President Bush if a stay were not granted. He held the counting of votes that are questionable legality threatens irreparable harm to Petitioner Bush and to the country by casting a cloud upon what he claims to be the legitimacy of his election. In Justice Scalia's words, proceeding with the election results that democratic stability requires. And very briefly, I'm going to address causation and redressability. Even though those two issues were not addressed in the lower court, and even though this court does not need to address those issues, but the county as well as the state brings them up, there is causation as it relates to the state and both the county. It's important to note that it does not matter what stage of the chain the state or the county is an actor. They can be the first part of the chain or the middle part of the chain or the last part of the chain. There is causation as it relates to the state because they have implemented, as I stated earlier, laws like universal vote by mail and have gutted signature verification requirements. And they do not require uniformity across county lines. And some appellants satisfy the requirements for standing. They need only address one theory of standing, but they have alleged several theories. Therefore, this court should reverse the lower court's decision and remand for further proceedings. And I would like to reserve the remaining time for rebuttal. All right. We'll hear from the other side. Good morning, Your Honors. May it please the court. John Echevarria for the state defendants, Secretary of State Weber, Governor Newsom, and Attorney General Bonta. I'll be splitting my time with counsel for the County of Santa Clara. I'll be addressing issues pertaining to all the defendants generally and the state defendants, and my colleague will be addressing issues related to the county defendants and any other issues that may come up. This court should affirm the district court's dismissal of plaintiffs' first amended complaint without leave to amend. Plaintiffs' theories in this case appear to be shifting before the district court and now before this court. But it appears that plaintiffs claim that the expansion of opportunities to vote by mail in the state of California and the Secretary of State's promulgation of regulations to counting, that these expansions of opportunities and creations of statewide standards harm plaintiffs because these rules create opportunities for ineligible votes to be cast and potentially counted. And also, apparently, that they may create opportunities for votes to be improperly standing under Article III, either with respect to injury or as well to causation and redressibility. Those two additional elements for standing are properly before the court. This court can address any issue relating to constitutional standing at any stage in the litigation, and we did raise these issues in the court below, and we raise them again here. Regarding injury to the plaintiffs as voters, their injury is speculative. The chain of inferences that one would have to assume to conclude that any Californian's vote was diluted by voter fraud or ineligible votes would be far too attenuated to establish a concrete, particularized, and critically imminent injury to any of the plaintiffs or to any voters. They haven't established that they have been injured by those rules because it's speculative. So they make a number of allegations going to how current procedures and facts on the ground, I guess, facilitate fraud so that the voter rolls include a number of people who are not eligible to vote. And there's the signature verification process is very lax, and the potential for stuffing envelopes can lead to fraud. So is it your position that the threat that the state has taken actions that raise a threat of fraudulent use of the ballots, which is not implausible, is not enough for an injury? Your Honor, I think there's always a threat, or I would say a possibility, that ineligible votes would be cast or counted. And plaintiffs' particular allegations here about, you know, certain discrete, what they refer to as irregularities in the counting of votes, it doesn't arise to an actual ineligible vote being cast. Well, they do talk about 22,000 ineligible voters. I mean, these are the allegations. We take them to the extent plausibly led as true. 22,000 ineligible voters on the rolls, voters being listed and sent ballots multiple times. So they do have specific allegations, although they don't make any allegations of fraud. Presumably, they say we would have to have an audit. But they do make allegations of practices that potentially facilitate fraud. So is that not enough? That is not enough, Your Honor. Why is that? Well, it's not enough for two reasons. Number one, there is the chain of inferences. Even if there are individuals on the voter rolls who should no longer be registered, and ballots are mailed to those individuals, and potentially, allegedly, remailed to them, there's still all these steps that this Court would have to assume actually occurred in the 2020 election. That people got ballots and sent them in when they were ineligible, that's only one step. And that they sent them in. I don't see the multiple steps. I mean, we have cases that say if a state action, for example, losing a laptop, or having procedures allow hackers into the computer system, could increase the possibility of losing your private information, that's enough for standing, the Krotner case. So is this not similar to that? Or would you say there's, what are the multiple steps, I guess, that make it speculative? So the multiple steps are that the expanded vote-by-mail and the regulations concerning signature verification, that this creates openings or opportunities for people to vote fraudulently, or potentially accidentally, ineligibly. And that when those votes are received, that those votes are actually counted. There are also various regulations and safeguards in place during the counting procedure. And also after the election, there are audit procedures, as Your Honor referred to, recount and also election contests that none of the plaintiffs allegedly pursued here, even if there was a risk of improper votes being counted. But I think what goes to the heart of plaintiff's standing problem here as voters, is that even if you assume all these chains of inferences, and assume that there were ineligible votes cast in the 2020 election, or it would be even more speculative with respect to future elections, but let's assume that, this would be the kind of generalized grievance that any voter in a California election would have. And precedent indicates that that is just not enough. Well, they're not asking the state to follow the rules. They're saying that their particular votes were diluted. And the Supreme Court has said voters are injured if their votes are diluted. Why is that a generalized grievance? Because the vote dilution here is not particular to the plaintiffs. There are many overlapping problems under Article III, but I'm going to focus on the particularity problem. If an ineligible vote is cast, and if that vote is counted, even if plaintiff's vote is diluted, anyone else's vote who voted in that election would be diluted. Right. There's no dispute. So why don't they all have injuries? Because there's... I mean, each of them is like a mass tort, right? In Lujan, Justice Scalia is careful to say, in a mass tort, everybody is injured. So why isn't everybody, every legitimate voter injured? Well, because Article III requires a particular injury to the voter. And plaintiffs haven't identified that they're a member of any discrete class that would have been treated differently, where their votes were diluted and other votes were not in an election in which ineligible votes were cast. Plaintiffs are free also to vote by mail. When they get their mail invalid, they can vote in person. All the votes in an election under the rules that they're challenging here are weighted equally. And that distinguishes this case from cases like Baker versus Carr, Reynolds versus Sims, cases in which there was actual vote dilution because the weights of votes were treated differently depending on where people lived. Could you address opposing counsel's organizational standing argument? Yeah, I would like to do that, Your Honor. So plaintiffs claim that Election Integrity Project has organizational standing simply because it spent more money doing the same activity that it normally does in furtherance of its mission. In paragraph 121 in excerpts of record 269, they do not allege any diversion of resources, which is an element for organizational standing in this circuit. There's not even a conclusory allegation of diversion of resources. We just decided a case, Sabra, where we said the Council on Arab... I forgot the answer. CAR, yeah. Because there was an Islamophobic statement by a professor had to do more of what they're doing, which is outreach and education. And that was enough. I mean, we have a very low bar for organizational standing. Why wasn't this enough? So in the Sabra case, the organization CARE actually had to create a new campaign to combat the Islamophobic statements being made by that teacher. And according to the opinion, the organization had to contract with an expert to bring in a new expert to work on this new advertising campaign. In general, where there's a diversion of resources, the organizations are doing something new operationally, potentially in furtherance of the same mission. But here, EIPCA is not alleging that they did anything new. They allege they had to hire a lot more observers, I think. Something along those lines. So they do allege... Right. They had to get more because now the irregularities were so widespread. Something along those lines. Yeah. So in paragraph 121, they do allege that they hired more election observers and deployed more election observers. I would note that at paragraph 22, excerpts of record 246, those volunteers are not hired by EIPCA. They're not compensated by the organization. And in fact, the first amended complaint alleges that many, quote unquote, many of the volunteers donate money in connection with the services that they volunteer and perform. So just facially, there is no... There's no conclusory allegation of diversion of resources, even if you assume that they had to spend money. But spending more money, doing what you normally do in furtherance of your mission is not sufficient for organizational standing. What do you make of... I mean, we've said both in Sabra and Friends of the Earth, which is also a recent case, that while going about business as usual is not enough, any sort of new allocation of resources is. And I'm looking at... If an organization alters its resource allegation to combat the challenge practices, if an organization decides to spend its money, time, resources in a new way in reaction to some situation, that meets our, as Judge Okuda said, very low standard. Even if this court standard is characterized as low, I would say it's not inconsistent with Lujan and Supreme Court precedents requiring an actual concrete injury to the organization. There are no conclusory allegations of diversion in the complaint. There are no allegations that money had to be shifted. There are no allegations of any new activity aside from the new election observers. But if this court were to find that EIPCA has organizational standing, then any organization could spend a dollar more to come into federal court and litigate what could effectively just be a policy difference. It would effectively... That may be where our law leads us. Yeah, I just ended on that point. Well, and I'd also draw your attention... We're discussing some cases that were not in the briefing, but I'd also draw the court's attention to East Bay Sanctuary Covenant versus Biden, in which there was a denial of en banc review. And there was a finding of organizational standing in that case because of the changes in asylum law. But in that case, and Judge Paez and his concurrence from the denial of en banc review, was very clear that there were concrete allegations and facts showing that the organization was directly harmed, that it was unable to find asylum seekers and to counsel them, that its funding was going to be reduced because of those changes, that the organization's facilities became effectively daycare centers because of the arrival of... So does that... Does your argument here really go more to leave to amend that they... If they could... We don't know that would be futile for them to amend to make these allegations, which you say the Ninth Circuit requires. So leave to amend would not be required. Plaintiffs haven't explained what diversion of resources they'd be able to allege in a second amended complaint. They didn't explain what new facts they could allege to the district court or to this court in the opening statements. But there's still an irremediable problem with plaintiff standing as an organization and also as voters and candidates, and that's the speculative nature of harm. In City of Lake Forest, this court made clear that the expenditure of resources can't just be voluntary. It has to be forced. It has to be caused by the change in law or whatever they're challenging to avoid some other injury to the organization. The other injury to election integrity project is the speculative potential ineligible votes or fraudulent votes being cast and potentially being counted. That kind of speculative injury, it effectively amounts to a generalized social interest, which this court and the Supreme Court has indicated can't be enough for an organization to establish standing. And it can't be enough for an organization to just spend money, a single dollar to avoid to get into federal court. More is required. Even if the bar is low in this circuit's precedence, there still are new activities that must be alleged and an injury that the organization is seeking to avoid. I'd also note in all the other organizational standing cases, there were concrete injuries that were being addressed. The asylum laws actually were changing the way that asylum seekers were entering the country and how the organization was able to meet them and to help them. In Havens Realty, the change, the racial discrimination in Havens Realty actually undermined the organization's ability to counsel its clients and help them get affordable housing. And it forced them to address racial discrimination, which is actually outside of their mission. They were focused on moderate and low-income housing. I'm going to give you a hypothetical. I mean, I'm not saying that this hypothetical is supported in the allegations, but if the facts were that we had an election integrity organization that for the last, we'll say, 10 election cycles had 1,000 monitor volunteers that were sitting at the polling places or wherever watching things and then some change in the law happens and now they have 10,000 monitors. Do you think that's not enough? Because it's the same activity they were already doing and they've just ramped it up? Well, I think there have would have to be, you know, factual allegations in a Rule 8 explaining, you know, what was required to hire these people? Were these people just volunteering like the volunteers? Let's say they're volunteers. What does that matter? I don't know that that would be enough, Your Honor. I think Article 3 is a, it's a demanding standard. It requires an actual injury to the organization. It doesn't allow an organization to do more of what it does operationally in furtherance of its mission to have standing. And I'd also like to note that before I hand it over to counsel for the County of Santa Clara, that leave to amend is futile on the face of the complaint based on the speculative injuries and the generalized nature of their injuries. And futility can be either declared by the district court or apparent. And it is apparent here and the court should affirm. Thank you. Good morning, Your Honors, and may it please the court. Mary Hanna, we are Deputy County Counsel for the County of Santa Clara. Registrar voters appearing on behalf of all county appellee defendants. Appellant's alleged injury of vote dilution is simply not well pled. But even if it were, it is not a constitutionally cognizable injury, in fact. This case is not akin to the vote dilution cases like Baker v. Carr and Reynolds v. Sims, where groups of voters had their votes weighed differently due to their place of residence or their race. Nowhere in the complaint, nor in the district court briefing or argument, nor on their appeal, do appellants make clear how their allegations of the possibility that somewhere in their contingent chain of events, some indeterminate number of potentially invalid ballots were counted and how that would specifically harm them rather than all voters casting valid ballots. Instead, the district court- I guess I have the same question there. I don't see what the effect is that registered voters as a group are injured. So we often have cases where large numbers of people are injured. That doesn't take away from the injury. If, in fact, there's widespread voter fraud, it would seem like all legitimate voters have their vote diluted. So what's the implication of many voters may be affected? I think there are two responses, Your Honor. First, I think if the court looks carefully through Baker v. Carr, the Supreme Court actually spent some time trying to figure out whether or not the case at issue was just justiciable at all or whether it was really raising a political question, better raised to the legislature. In particular, the courts have held that the Constitution is not an election fraud statute. We do have election fraud statutes in the state of California and that there are causes of action that can be brought under those in a timely manner. This case was brought after the deadline to request a recount or to raise an election contest. But if there is a generalized grievance for constitutional purposes, both states and Congress can create statutes that would be able to provide standing and recognize what would otherwise be considered a generalized grievance, which this is. So the Supreme Court was pretty clear in Lujan that for a generalized grievance is when the suit is to tell the government to follow its own procedures. That's not this sort of suit. This is a suit where someone is saying we were injured by the potential for widespread voter fraud, or that's at least one aspect of the claim. Yes, Your Honor. I think that as my co-counsel has explained, that is at base a very speculative injury. We don't have any allegations of the scope of invalid ballots that may have been cast. Allegations that you, that observers couldn't see portions of the process or that signature verification was allegedly lax or that late ballots might have been received and might have been counted is not the same as invalid ballots were actually cast and counted. We don't have any allegations in the complaint that we know that any of the invalid ballots were cast or were counted. And there are also no allegations that the mandatory post-election audits that all county elections officials conduct for every election were infirm in any way. Those are statutorily designed processes of the elections code that are meant to ensure that if there were mistakes in the process, in the original canvas, that they're caught and corrected before the election results are certified. And during that process, election observers can and often are there. And so if there were problems in those processes and not catching mistakes, that is, that should have been part of the complaint. I see I've run out of time. So county authorities would rest otherwise on our briefs. Thank you. Thank you for your argument. Okay, do you have some time for rebuttal? Thank you. I first want to address the appellee's argument as to the speculative nature of our claims. 600 affidavits are not speculative. Those affidavits are signed under penalty of perjury. And it's important to remember that the appellee's, I guess, theory of vote dilution is very myopic. They seem to think that vote dilution occurs only when there's, only where votes are weighted differently. But that would be inconsistent with Bush versus Gore. Vote dilution occurs when there is a possibility of vote cancellation and vote negation. And also in Bush versus Gore, it's important to note that in that case, the election hadn't even happened. There was no signed affidavits signed under penalty of perjury documenting irregularities. What the court had in front of them was that there was a lack of uniform practices that would inevitably lead to a disparate treatment of voters. Here... I mean, if we go back to the apportionment cases, Baker and Reynolds, the rule for dilution was that a favored group has full voting strength and a disfavored group has lesser strength. Are you saying that Bush v. Gore fundamentally changed that and expanded dilution to be other things in addition to that? I know it did not, Your Honor. Bush v. Gore is consistent with equal protection principles. The voters in those cases, it stood for the proposition that the voters in certain counties would inherently be treated differently. Right, so there's... Other counties. Right. And I'm sure you're aware that the 11th Circuit has addressed these issues and has gone the other way and said this is too generalized, that you have to have some point of comparison to show that one group is being treated better than another. And that's what I'm struggling with here on your argument that the individuals as voters have standing because who's the comparator? The illegitimate voters? But then everybody is impacted by that in the exact same way. And that's not the scenario in the apportionment cases. The comparators would be the counties that have more robust signature verification requirements and more... No, I mean, that's why I was asking those questions because that wasn't my understanding of your complaint and how it was structured. So I went back and looked at your complaint and you do have paragraphs that are county specific. But the way I read them, it's observations about alleged disparities. But there's no allegation like the county has interpreted California law to require something different, that there's different policies in place. It's just observations of how things were happening in various counties. So I'm still struggling with what are you saying is the disparate standard from county to county other than you're just observing different things? So we allege specific observations, but we also allege in the statement of facts that counties were applying... They were applying different time periods for when they were determining, when they were verifying signatures. They apply different procedures for adjudication and remaking of ballots. And so that is alleged in the statement of facts. And I wanna talk real quickly about organizational standing. And the plaintiffs or the appellants do allege in paragraph 108 that due to expanded vote by mail and due to the lax signature verification requirements, that the organization had to expend more resources on voter observation and voting documented irregularities than they would have had those practices not been enforced. And they spent more money on those issues than in prior elections. And so that's really all I have to say. And I thank you so much for your time. All right. We thank both sides for their argument in the case of Election Integrity Project, California versus Weber is submitted. And we are now adjourned for this session and for the week. All rise. This court for this session stands adjourned.
judges: IKUTA, FORREST, THOMAS